**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**
**INDIANAPOLIS DIVISION**

|  |  |
|---|---|
| **FAIR HOUSING CENTER OF CENTRAL INDIANA, INC; and DONATA BANKS,** ) | **Case No. 1:20-cv-1176 TWP DLP** |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **vs.** ) | |
| ) | |
| ) | |
| **VICKI NEW; KIRKPATRICK MANAGEMENT COMPANY, INC.; and TWIN CREEKS HOMEOWNERS ASSOCIATION, INC.,** ) | |
| ) | |
| ) | |
| ) | |
| ) | |
| **Defendants.** ) | |

**BRIEF IN OPPOSITION TO DEFENDANTS' KIRKPATRICK MANAGEMENT COMPANY, INC. AND TWIN CREEKS HOMEOWNERS ASSOCIATION, INC.'S MOTION FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS

I.    STATEMENT OF MATERIAL FACTS IN DISPUTE . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    A.    Facts concerning the governance and rules of Twin Creeks .. . . . . . . . . . . . . . . . 2

    B.    Facts concerning Kirkpatrick's management at Twin Creeks. . . . . . . . . . . . . . . 4

    C.    Defendants' knowledge of Vicki New's abusive and discriminatory conduct. . . . 4

    D.    Facts concerning Plaintiff Donata Banks' tenancy. . . . . . . . . . . . . . . . . . . . . . . . 9

    E.    Facts establishing that Defendants engaged in disparate treatment

        when enforcing the CC&Rs.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

II.   ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

III.  THE LEGAL FRAMEWORK OF THE FAIR HOUSING ACT . . . . . . . . . . . . . . . 14

    A.    The FHA does not exempt homeowners associations or management

        companies that affect the use and enjoyment of dwellings... . . . . . . . . . . . . . . . 14

    B.    Defendants may be directly liable for their tolerance of racial harassment. . . . . . 16

    C.    The conduct here violated the FHA and IFHA. . . . . . . . . . . . . . . . . . . . . . . . . . 17

    D.    The undisputed facts do not show that defendants lacked notice of

        discriminatory animus until July of 2018. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

    E.    The undisputed facts do not show that defendants acted promptly

        and reasonably when they learned of Vicki New's discriminatory animus. . . . . . 27

    F.    The moving defendants are directly liable for violations of 42 U.S.C. § 1982. . . 30

    G.    Direct liability based on tolerating the acts of a third party is not a novel

        theory.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

Between 2015 and 2018, Vicki New terrorized her Black and Latino neighbors, unchecked by the homeowners' association that governs the Twin Creeks community or the management company that it hired to protect it. Vicki New repeatedly harassed Donata Banks and her neighbors, calling them "n___", "stupid Black bitches," "spics," "fucking Mexican trash," and "pieces of shit who should go back to [their] country." Her brazen use of racial slurs and threats took place out in the open on Twin Creeks Drive, the main north-south artery within the Twin Creeks subdivision. This Court has entered default judgment against Vicki New on all claims. (*See* Dkt. 82.)

The moving defendants in this action – Defendants Kirkpatrick Management Company, Inc. and Twin Creek Homeowners Association, Inc. – were aware of New's conduct by September 2016, when their attorney wrote that New was "pursuing an unrelenting agenda of harassment, discrimination and bullying," and "constantly found in the community verbally assaulting owners and on one occasion spoke to a resident using racial epithets." (*See* Dkt 97-11 at 3.) Despite this knowledge, and other reports from residents throughout 2016 and 2017, defendants continued to allow New to roam the community antagonizing residents based on their race or national origin without consequence, until New's harassment reached such a crescendo that a videorecording of New assaulting her neighbors and yelling racial slurs was broadcast throughout Indianapolis on the news. But by then, the damage had already been done.

Defendants' motion for summary judgment (hereafter "Motion") must be denied in its entirety, because they misunderstand and misapply the relevant legal standards, and omit and misstate relevant material facts. There are significant facts in dispute – such as what defendants knew or should have known about Vicki New's conduct, when they knew it, what actions they could have taken to curb her conduct, and whether their actions were sufficient – that are solely within the province of the fact-finder. Moreover, defendants' motion repeats the same arguments

1

from its motion for judgment on the pleadings concerning inapplicable exemptions and other defenses that do not apply here. (*See* Dkt. 13-14.) This court should deny summary judgment to defendants, just as it denied defendants' motion for judgment on the pleadings. (*See* Dkt. 60.)

## I.    STATEMENT OF MATERIAL FACTS IN DISPUTE

### A.  Facts concerning the governance and rules of Twin Creeks

As Defendants correctly assert, the Twin Creeks subdivision is governed by various rules, many of which are set forth in the Declaration of Covenants, Conditions, and Restrictions ("CC&Rs"). (Motion at 1.) Among other things, these CC&Rs provide:

> Nothing shall be done or kept in any Lot or in any Home or on or in any Common Area or any part thereof, which would be in violation of any statute, rule, ordinance, regulation, permit or other validly imposed requirement of any governmental body.

(*See* Dkt. 97-10 at page 16, Art. IX, § 13.) In addition, the CC&Rs provide that:

> No noxious, destructive or offensive activity shall be allowed in any Homes, on any Lots or in the Common Area or any part thereof, nor shall anything be done thereon which may be or may become a nuisance to any other Owner or to any other person at any time lawfully residing on the Property.

(*Id.* at pages 16-17, Art. IX, § 13.)

The CC&Rs also lay out specific consequences for those who fail to follow Twin Creeks rules, including suspending a homeowner's voting rights. (*Id.* at page 7, Art. IV, § 2B.) The CC&Rs empower the Twin Creeks HOA to enforce the CC&Rs, the Articles of Incorporation and By-Laws by initiating "any proceeding at law or in equity… either to restrain violation, to compel compliance, or to recover damages…" (*Id.* at page 25, Art. XIII, § 1; *see also id.* at page 26, Art. XV) (repeating the HOA's right to bring an enforcement action against any "violation or threatened violation" of the CC&Rs").

The CC&Rs, bylaws, and other rules that govern Twin Creeks may be amended by the HOA Board. (*Id.* at page 18, Art. IX § 19.) In fact, they have been amended on numerous occasions,

2

including to limit the number of homeowners who may rent their houses to tenants. (Deposition of Kevin Patterson, ("Patterson depo.") at 63:10-14; Deposition of Vincent White ("White depo."), at 36:13-15. Relevant excerpts of these depositions are attached to the Declaration of Liza Cristol-Deman, filed herewith, ("Cristol-Deman Dec.") as Exhibits 6 and 8 respectively.) Moreover, the CC&Rs empower the Board to pass "reasonable rules, with respect to the Common Area, for the health, comfort, safety and welfare of persons." (Dkt. 97-10 at page 7, Art. IV, § 2A.) In 2003, the Board exercised that power and adopted "Rules and Standards for Homeowners of the Twin Creeks Homeowners Association", including: "Any noise or activity, which disturbs the serenity of the neighborhood, is prohibited." (Patterson depo. at Exhibit 6 and 68:18-69:11)

The Twin Creeks HOA hired Kirkpatrick Management Company to manage Twin Creeks in 2009 and terminated their services in January 2021. (Deposition of Wyatt Smith ("Smith depo.") at 19:25-20:2, 33:5-6, relevant excerpts attached to the Cristol-Deman Dec. as Exhibit 7.) Kirkpatrick assigned a community manager to Twin Creeks, with the role of maintaining common areas, monitoring residents' compliance with CC&Rs, addressing any rule violations, interacting with residents, and communicating with the Board. (Patterson depo. at 34:17-35:5, 55:2-56:11.) During its tenure, Kirkpatrick was the main point of contact for residents, as residents typically were not provided with phone numbers for board members. (*Id.* at 137:17-138:1.)

Kevin Patterson was the property manager at Twin Creeks from 2013 to approximately June or July 2017. (Patterson depo. at 23:23-24:10.) He left because the Board expressed dissatisfaction with the amount of time and level of service he was providing at Twin Creeks. (*Id.* at 26:3-22). His successor as manager at Twin Creeks was Vincent White. (*Id.* at 29:9-12.) A relative of White's hired White to work at Kirkpatrick with no previous experience in property

3

management of any kind. (White depo. at 17:17-18:11.) White left Twin Creeks, Kirkpatrick, and property management altogether after two years. (*Id.* at 11:18-20; 12:11-22.)

### B.  Facts concerning Kirkpatrick's management at Twin Creeks

Part of the manager's job is to inspect the subdivision on a regular basis, note violations of the CC&Rs, and then write letters to homeowners to correct the violations. (Patterson depo. at 34:17-35:5; 70:14-71:9.) Patterson conducted these inspections two to three times per month. (*Id.* at 73:8-18.) White conducted them at least once per week. (White depo at 33:12-25.)

When a manager learned of a rule violation from an inspection or a complaint, the practice was to log it into a computer spreadsheet or database and then generate a letter to be mailed to the homeowner. (Patterson depo. at 70:25-71:14; 75:20-76:1; White depo. at 43:5-12; 45:13-16.) The letter would request corrections within 10, or 20, or 30 days, depending on the violation. Some violations had to be fixed immediately, such as those that could injure someone. (Patterson depo. at 85:20-86:15.) After three notices of violations went unheeded, Kirkpatrick had a policy of referring the violation to their legal counsel. (White depo. at 46:7-10.)

Residents with complaints sometimes called Patterson's direct line, but they also called the main number for Kirkpatrick. Callers frequently spoke with customer service representatives, and sometimes landed in Patterson's voice mail. (Patterson depo. at 56:20-57:6.)

### C. Defendants' knowledge of Vicki New's abusive and discriminatory conduct

The moving defendants admit that they were aware that Vicki New harassed her neighbors over "property-related complaints" (Motion at 4), but claim that her racial animus and ethnic slurs were unknown to them until July 2018. (Motion at 6-7.) Defendants' own words tell a different story. On September 25, 2016, the HOA's agent, attorney Greg Chandler, characterized Vicki New as "antagonistic", "abusive," "frightening," "combative," and "disruptive," in a letter sent to New's

4

attorney on behalf of the HOA Board. (*See* Dkt. 97-11 at 3-5.) The letter states that Vicki New "can be found roaming the community, trespassing, verbally berating homeowners and residents, and standing in front of her property yelling at neighbors" on "an almost daily basis." (*Id.* at 3.) The letter also reports that a homeowner complained that "New is constantly found in the community verbally assaulting owners and on one occasion spoke to a resident using racial epithets." (*Id.*) The letter added that "The concern is widespread." (*Id.* at 5.) Counsel's September 2016 letter demonstrates that New did not spend "most of her tenure in Twin Creeks" focused on petty property issues. (Motion at 4.)

By contrast, three months earlier, a letter from Chandler raised concerns about New confronting residents and contractors as if she were as a member of the Board – essentially the complaints about the Board's authority that defendants admit they knew about. (Dkt. 97-11 at 1-2.) The September 2016 letter addresses far more serious allegations of abusive and illegal behavior, including "discriminatory comments. (Dkt. 97-11 at 3.)

Other evidence also will establish that defendants knew or should have known about Vicki New's race-based conduct in 2016. Kevin Patterson received "in the ballpark" of more than 20 complaints about Vicki New between the time that she moved in in March 2015 until he left his position at Twin Creeks in June or July 2017. (Patterson depo. at 95:2-18.) As early as October 2015, Patterson told one of New's neighbors, who had just moved in, that Vicki New was "a problem for the community," and that the neighbor should call the police if New confronted her. (Declaration of Lizette Quinonez ("Quinonez Dec.") at ¶ 6, attached to the Cristol-Deman Dec. as Exhibit 3.) This is consistent with Patterson's practice of advising residents who complained about Vicki New to call the police (Patterson depo. at 129:6-15; 145:14-24) – advice that would make no sense if Vicki New's conduct was a mere annoyance about abiding by the community rules.

5

One resident who complained of Vicki New's racial harassment in 2016 was Darryl Crenshaw. Crenshaw complained following an incident when Vicki New yelled at him and his adult daughter, stating that he needed to control that "n____ bitch." (*See* Declaration of Darryl Crenshaw at ¶ 8, attached to the Cristol-Deman Dec. as Exhibit 2.) When Donata and Corey Banks heard the commotion and came outside, New said she "can't stand none of you n___s, fags, and Mexicans." (*Id.*) Kevin Patterson recalled that Darryl Crenshaw complained about Vicki New. (Patterson depo. at 148:12-20.) Patterson equivocated about whether any resident told him that Vicki New used the "N word," but that it "wouldn't have surprised" him. (*Id.* at 147:11-22.)

Crenshaw was not the only Black resident who complained. There were many other red flags throughout 2016, and 2017 indicating that Vicki New was abusive, threatening, and discriminatory to her neighbors. Some of the specific, documented complaints that Patterson received about Vicki New in 2016 and 2017 include:

Three times in 2016: African American resident Latheresa Henderson-Diaz, who lived in the same house that Donata Banks later rented, complained three times that Vicki New repeatedly called her a "bitch n____ renter," her teenaged daughter a "whore," and her teenaged sons "drug lords." New threatened to kill them. (Declaration of Latheresa Henderson-Diaz, attached to Cristol-Deman Dec. as Exhibit 5 ("Henderson-Diaz Dec."), at ¶¶ 5, 7). Henderson-Diaz moved out because of Vicki New's harassment, which was not addressed by defendants. (*Id.* at ¶ 11-12.)

March 31, 2016: Red Door Property Management emailed Kevin Patterson to share an account of Vicki New "bullying" her neighbor. (Patterson depo. at Exh. 10 at 2-3 and 109:16-19.)

April 13, 2016: Red Door Property Management again contacted Kevin Patterson, because Vicki New called Red Door to complain about the house next door and falsely claimed to be the incoming head of the HOA. The email indicates that the rental company had been previously

"instructed by the HOA and the Owner to contact the police if she steps foot on the property or attempts to make contact with any of our employees or tenants." (Patterson depo. Exhibit 10.)

April 24, 2016: Patterson received a written complaint from a resident that Vicki New was yelling in the street. The resident watched from his porch and started to videotape the confrontation on his phone. Vicki New saw the phone and threatened to break it "in a menacing way." (*Id.* at Exh. 16 and 121:2-14.)

June 2016: A homeowner complained to Patterson that Vicki New's unrelenting harassment was so severe that he had decided to sell his house. (*Id.* at Exh. 14 and 124:25-125:13, 126:17-22; 127:8-22.)

September 6, 2016: Lizeth Quinonez, a Latino resident, complained to Kirkpatrick that Vicki New claimed that her licensed, in-home daycare was "illegal," and referred to a mixed-race family as "pieces of shit who do not belong here." (Quinonez Dec. at ¶ 7-8.)

September 16, 2016: a real estate agent from Red Door Property Management complained that Vicki New fed false information to a would-be buyer and let her pit bull loose in the yard of the property during a showing. (Patterson depo. at Exhibit 15 and 133:15-7; 134:8-13.)

March 29, 2017: A resident named Sarah Paschall contacted Kirkpatrick and spoke with a customer service representative on behalf of Lizeth Quinonez. (Quinonez Dec. at ¶ 12; Patterson depo. at Exhibit 19 and 142:2-143:19.) Ms. Paschall complained that Vicki New was "accosting and harassing neighbors." Patterson responded that "we are not doing much but telling homeowners to call police, we can't do anything." (*Id.* at Exhibit 19 and 142:2-143:19; Quinonez Dec. at ¶ 12.)

March and August 2017: Resident Luvia Roman, a Latina neighbor, complained in March 2017 that Vicki New was taking photos of her and her guests. (Declaration of Luvia Roman,

attached to Cristol-Deman Dec. as Exhibit 4, at ¶ 4.) She complained again in August to a member of the HOA Board that Vicki New was harassing her family, including derogatory comments based on her ethnicity. (*Id.* at ¶¶ 6-7) (Many other ethnic slurs and intimidation tactics ensued. A year after Roman's second plea for help, Vicki New was charged with assaulting Ms. Roman's husband in a racist incident videoed by Luvia Roman and broadcast on the local news. *Id.* at ¶¶ 8-17.)

These are only the ***documented*** complaints that defendants received about Vicki New in between 2016 and 2017. Customer service representatives who answered the phone at Kirkpatrick were not instructed to keep a log of their interactions about Vicki New until much later, in around August 2018, and even those logs did not capture all complaints. (White depo. at 108:24-109:7; 125:14-17.) Nor were all calls memorialized. (*Id.* at 68:22-24; 83:11-19.)

This evidence shows that defendants either knew or should have known that Vicki New's harassment of her neighbors exceeded mundane property issues and crossed the line to illegal activity in 2016. Her harassment was overt, taking place on the main streets and sidewalks of Twin Creeks. Vicki New's house and Plaintiff Donata Banks' house, which was previously occupied by Latheresa Henderson-Diaz, were located on Twin Creeks Drive, the main north-south artery in the neighborhood. (Deposition of Donata Banks ("Banks depo.") at 26:23-10 and Exhibit 1, filed in full as Dkt. 97-1 and also attached as Exhibit 9 to the Cristol-Deman Dec.; Henderson-Diaz Dec. at ¶ 2.) As defendants' attorney wrote in September 2016, "the entire Twin Creeks Community is keenly aware of Ms. New and her concerns. On an almost daily basis, Ms. New can be found roaming the community, trespassing, verbally berating homeowners and residents, and standing in front of her property yelling at neighbors." (Dkt. 97-11 at 3.)

The testimony also establishes that Kevin Patterson, the manager who received more than 20 complaints about her, repeatedly underestimated the threat that she posed. Patterson testified

that Vicki New was "more wind that anything." (Patterson depo. at 156:15-20). While he conceded that residents considered Vicki New "rude," Patterson just "felt sorry for her." (*Id.* at 130:25-131:10.) Patterson ultimately chose to do nothing to protect residents because he concluded that "Vicki New was not a threat to me." (*Id.* at 130:16-21.)

### D.      Facts concerning Plaintiff Donata Banks' tenancy

The house in Twin Creeks that Donata Banks rented was owned by Eleanor Govindarajoo. (Motion at 2.) At the time that Ms. Govindarajoo rented her house to Donata Banks, Eleanor Govindarajoo was a real estate professional licensed in Indiana. (*See* Cristol-Deman Dec. at ¶ 12 and Exhibit 11.)

Donata Banks did not receive copies of the CC&Rs or any other rules when she moved into her house in Twin Creeks or at any other time during her tenancy there. (Banks depo. at 143:16-18.) In fact, Ms. Banks did not know that the Twin Creeks house was governed by a homeowners' association when she moved in. (*Id.* at 25:25-26:3.) Ms. Banks was never informed of the management company or any officers of the HOA, or how to contact them. (*Id.* at 68:3-12.)

Nevertheless, after Ms. Banks received a notice regarding errant grass growing in her sidewalk or driveway in apparent violation of the CC&Rs, Ms. Banks called the number for Kirkpatrick listed on the notice and left a message. (*Id.* at 80:18-81:15.) She said that she needed to speak with Kirkpatrick because she was experiencing problems with a racist neighbor that Kirkpatrick had never addressed. Defendants did not return her call. (*Id.* at 81:16-82:12)

Defendants seek to minimize the hostile environment tolerated by Defendants in Twin Creeks by asserting that "Ms. Banks enjoyed living in her home." (Motion at 3.) But Ms. Banks' testimony does not support such an unqualified statement. Banks testified that she enjoyed the Twin Creeks house *except for Vicki New's constant harassment*. (Banks depo. at 160:24-161:3.)

Moreover, citing testimony in which Ms. Banks says that she did an inspection of the house before agreeing to rent it, and it "was perfect" (*id.* at 23:14-17), defendants draw an improper conclusion about Ms. Banks' entire tenancy. At the time that Ms. Banks inspected the house, she did not know that the neighbor who lived across the street was an abusive racist. Ms. Banks' use of the adjective "perfect" refers to her initial impression of the house itself, not the environment created by New and maintained by the moving defendants, which would only become unbearably hostile with time.

Nor does the second passage of Ms. Banks' cited testimony lead to the conclusion that Ms. Banks unequivocally enjoyed her house in Twin Creeks. (*Id.* at 160:11-23.) In their citation to this passage, defendants omit the question posed:

> Q.   **So other than Vicki New,** did you have any other complaints about Twin Creeks at that time?
> A.   Other than them sending me the notices about my grass. I mean, no. For the most part, I liked my house.

(*Id.* at 160:24-161:3, emphasis added.) Defendants' counsel specifically instructed Ms. Banks to put aside her problems with Vicki New in answering the question. Those problems included frequent racial taunts directed at her family and her neighbors, including the N-word, "stupid Black bitches," and "spics." (*Id.* at 59:10-17; 63:12-14, 61:7-8, 141:21, 177:19, 39:11-13, 54:25-55:3.) Ms. Banks was present when Vicki New yelled at Darryl Crenshaw that the "neighborhood was better without you n____s," or similar words. (*Id.* at 38:9-39:6; Crenshaw Dec. at ¶ 8.) Vicki New even harassed Ms. Banks' visiting relatives, telling them to "get [their] Black asses back in the house." (*Id.* at 43:24-44:25, 47:8-14.) The harassment became so intolerable that Banks was "just staying in the house. So interaction [with Vicki New] was limited…I even got my mail from my car." (*Id.* at 57:17-22.)

Similarly, defendants omit key pieces of testimony when alleging that the only reason that Ms. Banks moved out of her home was because her mother was aging. (Motion at 3.) In fact, Ms.

Banks stated that she moved out because "it was time." (Banks depo. at 18:25-19:2.) When asked to elaborate, she testified that "a lot had gone on while we resided there." (*Id.* at 19:3-4.) She then added that her mother was aging, and that they felt it best to move closer to family on the east side of town. (*Id.* at 19:4-7.) As this testimony shows, Ms. Banks' mother's age was one, but not the only, reason that they left.

Defendants also inaccurately report that Banks "celebrated" defendants' cease-and-desist letter on her Facebook page. (Motion at 9.) On the contrary, the Facebook post that defendants quote, in which Banks expresses support for her community "coming together to rise up" against Vicki New, was posted on August 9, 2018. (*See* Banks depo. at Exhibit 7.) Defendants' cease-and-desist letter was not sent until nearly one month later, on September 4, 2018. (Dkt. 97-11 at 6.) Banks testified that she posted on Facebook because neighbors were unified in their opposition to Vicki New after New's harassment had led residents to "kind of stay[] in their house." (Banks depo. at 177:14-178:1.) Neighbors' support made Banks "feel like we're coming together on one accord even though no one else was helping us." (*Id.* at 177:25-178:1.) At the time of Banks' Facebook post, neither the HOA nor Kirkpatrick had scheduled any meetings with residents to discuss Vicki New's conduct. (*Id.* at 178:2-7.)

### E.  Facts establishing that Defendants engaged in disparate treatment when enforcing the CC&Rs.

Defendants claim to have strictly enforced the CC&Rs at Twin Creeks, and that the HOA Board was "very strict" and "took an active interest" in enforcing the rules. (Patterson depo. at 26:14-15; White depo. at 35:17-18; 46:11-25.) In fact, Kirkpatrick logged hundreds of violations of CC&Rs and issued hundreds of letters to residents who violated CC&Rs during the period of time that Vicki New lived there, including offenses such weed growth and improper placement of garbage cans. (Cristol-Deman Dec. at ¶ 15.) But defendants ignored and did not send letters for

11

violations unrelated to the appearance of property such as those created by Vicki New. (White depo. at 47:1-10; Patterson depo. at 74:3-10.) White had no idea that any CC&Rs pertained to anything other than aesthetics. (White depo. at 47:1-10.)

In fact, no agent of Kirkpatrick, other than Greg Chandler, *ever* communicated with Vicki New to advise her to stop harassing her neighbors, engaging in nuisance activities, and interfering with the serenity of the neighborhood.  Kirkpatrick never logged any violation of the CC&Rs by Vicki New, despite dozens of complaints, into their tracking system. (Patterson depo. at 88:12-25.) Property managers never sent Vicki New a single letter or verbally warned her regarding CC&R violations except for a single notice regarding the placement of her garbage cans. (Patterson depo. at 88:12-25; White depo. at 77:15-18.) Neither did any member of the HOA's board of directors. (Smith depo. at 116:19-117:2.)

By contrast, two aspects of Vicki New's conduct did raise the ire of the HOA and Kirkpatrick, leading to a community-wide warning and a lawsuit against her. When Vicki New's conduct undermined the Board's authority or Kirkpatrick's role as manager, defendants acted aggressively to curtail her behavior and advise the entire community that Vicki New was not an authorized representative. (Patterson depo. at Exhibits 12 and 13 and 115:5-8, 116:13-23, 118:6-15, 119:2-12.) By contrast, defendants never sent a letter to the community as a whole, or even to any of Vicki New's neighbors or victims, to warn them of Vicki New's discriminatory conduct.

Likewise, Twin Creeks aggressively looked after its own financial interests when Vicki New failed to pay her homeowners association assessments in March 2017. (Motion at 5-6, Dkt. 97-12.) Twin Creeks was prepared to move forward with a foreclosure and sheriff's sale in September 2017, when New satisfied the judgment. (*Id.*)

## II.    ARGUMENT

Summary judgment is not appropriate unless the moving party has shown that either no material facts are in dispute, or no reasonable jury could find in favor of the non-moving party on any disputed facts. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Scott v. Harris*, 550 U.S. 372, 380 (2007). "A genuine dispute as to any material fact exists 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Daugherty v. Page*, 906 F.3d 606, 609-10 (7th Cir. 2018) (*quoting Anderson*, 477 U.S. at 248). A court must deny a motion for summary judgment when the nonmoving party presents admissible evidence that creates a genuine issue of material fact. *Luster v. Ill. Dep't of Corr.*, 652 F.3d 726, 731 (7th Cir. 2011).

At summary judgment, the court considers "all of the evidence in the record in the light most favorable to the non-moving party," and draws "all reasonable inferences from that evidence in favor of the party opposing summary judgment." *Donald v. Wexford Health Sources, Inc.,* 982 F.3d 451, 457 (7th Cir. 2020) (citing *Dunn v. Menard, Inc.*, 880 F.3d 899, 905 (7th Cir. 2018)). The Court cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the fact-finder. *Johnson v. Advocate Health and Hosps. Corp.*, 892 F.3d 887, 893 (7th Cir. 2018); *Hutchison v. Moore*, Case No. 120CV02442TWPMPB, 2021 WL 2515313, at *1 (S.D. Ind. June 17, 2021).

Much of the defendants' attempt to dispose of this case prior to consideration by a fact-finder rests on legal theories that are incorrect and that have already been rejected by this Court. Summary judgment is not the appropriate vehicle to relitigate legal theories already rejected by the Court in the same matter. *See Sutherland Paper Co. v. Grant Paper Box Co.,* 8 F.R.D. 416 (W.D. Pa. 1948) (defendants not permitted to reargue issues from motion for judgment on the pleadings under the guise of a summary judgment motion); *see also Crown Cork & Seal Co. v. Hires Bottling Co.*, 254 F. Supp. 424 (N.D. Ill. 1966) (confining consideration of a motion for

summary judgment after a motion for judgment on the pleadings to matters submitted outside the pleadings), *rev'd on other grounds*, 371 F.2d 256 (7th Cir. 1967).

### III.   THE LEGAL FRAMEWORK OF THE FAIR HOUSING ACT

The Fair Housing Act prohibits all "discriminatory housing practices" based on race and national origin, defined as acts in violation of 42 U.S.C. §§ 3604 and 3617. 42 U.S.C. § 3602(f). The substantive sections that apply in this case are sections 3604 and 3617. These sections prohibit a broad range of conduct, as discussed further below.[1] The evidence in this case establishes that defendant Vicky New, a white woman, targeted her Black and Latino neighbors, including plaintiff Donata Banks, for racial harassment while each occupied homes regulated by the moving defendants. Plaintiffs claim that New's racial harassment violated 42 U.S.C. §§ 3604(a), (b), (c) and 3617 and that the moving defendants are directly liable for tolerating those violations.

#### A. The FHA does not exempt homeowners associations or management companies that affect the use and enjoyment of dwellings.

Again, defendants revisit their erroneous legal claim that they are improper defendants because they are not "housing providers." (Motion at 16-17.) This Court has already ruled that both the FHA and IFHA "appl[y] to Association Defendants who affect access to, use of, and enjoyment of housing. Homeowners' associations and property management firms affect the use and enjoyment of housing, so they can be liable under the Act for discriminatory housing practices." (Dkt 60 at 11.) That ruling was entirely consistent with extensive case law holding a wide variety of actors liable for conduct that affects access to, and terms and conditions related to, dwellings. *See, e.g., Georgia State Conference of the NAACP v. City of LaGrange, Georgia,* 940 F.3d 627,

---

[1] The Indiana Fair Housing Act is interpreted consistently with the federal Fair Housing Act; it contains "many parallel provisions and similar language." *Wilson v. Wilkening*, No. 20A-PL-1960, 2021 Ind. App. LEXIS 234, at *7 (Ind. Ct. App. July 28, 2021) (*citing Furbee v. Wilson*, 144 N.E.3d 801, 806 (Ind. Ct. App. 2020)).

635 (11th Cir. 2019); *National Ass'n for the Advancement of Colored People v. American Family Mutual Ins. Co.*, 978 F.2d 287, 297-300 (7th Cir. 1992).

There is no evidence or new authority that should lead the court to revisit its previous ruling. The FHA has not been amended to limit liability to "housing providers" since the court issued its order in July 2021. In the absence of any statutory amendments, code changes, or new case law under the FHA, defendants rely on an abridged summary of the FHA from a website. (Motion at 17.) Summaries on websites are not a proper source for interpreting the law, especially where the law itself is clear on its face. *See, e.g, League of Women Voters v. Sullivan,* 5 F.4th 714, 723 (7th Cir. 2021) (citation omitted) ("If the language is clear and unambiguous, we give effect to its plain and ordinary meaning and cannot resort to judicial construction."); *U.S. v. Melvin*, 948 F.3d 848, 852 (7th Cir. 2020) ("If the statutory language's plain meaning is unambiguous, our inquiry ends there.")

Defendants also revisit their previous request for this court to excuse their conduct because Ms. Banks resided in a single-family home. (Motion at 15-16.) This issue, too, was previously disposed by the court, which held that the limited single-family home exemption set forth in 42 U.S.C. § 3603 (b) does not apply here. (Dkt. 60 at 11.) By the express statutory language of § 3603(b), the owner of the single-family home selling or renting her house may be exempt from liability under some circumstances, but not a homeowners association or a management company that "affect[s] access to, use of, and enjoyment of housing." (Dkt. 60 at 11; *see also Whisby-Myers v. Kiekenapp*, 293 F.Supp.2d 845, 851 (N.D. Ill 2003).) This court's prior ruling is consistent with case law rejecting the single-family home exemption for municipal zoning ordinances that affect single-family homes (*see*, *e.g., Smith & Lee Assoc., Inc. v. City of Taylor*, 13 F.3d 920, 924 n.5 (6th Cir. 1993)), a developer  in a subdivision of single-family homes (*see*, *e.g, Dillon v. AFBIC*

*Dev. Corp.,* 597 F.2d 556, 561 (5th Cir. 1979), and homeowners associations that govern single-family homes (*see*, *e.g, Massaro v. Mainlands Section 1 & 2 Civic Ass'n*, 3 F.3d 1472 (11th Cir.1993), *cert. denied*, 513 U.S. 808 (1994)). *See also Hill v. River Run Homeowners Ass'n, Inc.*, 438 F.Supp.3d 1155, 1163 (D. Id. 2020) (noting that HOA did not dispute that plaintiff's single-family home was covered under the FHA in granting summary judgment based on discriminatory HOA rules). Defendants cannot point to a single case in which a court has held that this exemption applies to a homeowners' association or property management company.[2]

### B. Defendants may be directly liable for their tolerance of racial harassment

The language of the FHA does not prohibit certain actors from committing discriminatory housing practices. Rather, the FHA focuses on prohibited acts. *Meyer v. Holley*, 537 U.S. 280, 285 (2003). It does not specify who may be held liable for those acts. Likewise, the IFHA does not define or list who is liable for prohibited acts. Ind. Code § 22-9.5-5 *et seq.*

Here, HUD regulations provide the basis for imputing liability for New's misconduct to the moving defendants. Drawing on ordinary tort principles, the HUD rule "sets forth how these traditional liability standards apply in the housing context," defining "the circumstances under which they will be subject to liability under the Fair Housing Act for discriminatory housing practices undertaken by others." 81 Fed.Reg. 63054, 63055 (09/14/2016).

> A person is directly liable for (i) The person's own conduct that results in a discriminatory housing practice; (ii) Failing to take prompt action to correct and end a discriminatory housing practice by that person's . . . agent, where the person knew or should have known of the discriminatory conduct; and (iii) **Failing to take prompt action to correct and end a discriminatory housing practice by a third-party, where the person knew or should have known of the discriminatory conduct and had the power to correct it.**

---

[2] Even the owner of the single-family home that Ms. Banks rented would not qualify for the exemption if she were named as a defendant here, because she was a licensed real estate professional when she rented the house to Ms. Banks. (Cristol-Deman Dec. at ¶ 12.) *See* 42 U.S.C. § 3603 (b)(1).

24 C.F.R. § 100.7 (a)(1) (emphasis added). This regulation is entitled to deference. *Meyer,* 537 U.S. at 281; *see also Bloch v. Frischolz*, 587 F.3d 771, 782 (HUD regulations under the FHA are entitled to great weight).

HUD also specifically tackled the legal question regarding imputation of liability to an HOA for the misconduct of residents and third parties. "[A] community association generally has the power to respond to third-party harassment by imposing conditions authorized by the association's CC&Rs or by other legal authority. Community associations regularly require residents to comply with CC&Rs and community rules through such mechanisms as notices of violations, threats of fines, and fines." 81 Fed.Reg. at 63068; *see also Wilstein v. San Tropai Condo. Master Ass'n*, 1999 U.S. Dist. LEXIS 7031, *28–33 (N.D. Ill. Apr. 21, 1999).

Thus, determining whether the moving defendants may be held directly liable for their failure to take prompt action to correct or end New's racial harassment of her neighbors depends on evidence showing that they knew or should have known about her racial harassment and were empowered to take action to stop it. The evidence produced by plaintiffs requires that each question be answered in the affirmative.

### C.  The conduct here violated the FHA and IFHA.

Section 3604(a) of the FHA makes it a discriminatory housing practice to "discriminate in the sale or rental, or to otherwise make unavailable or deny, a dwelling" because of race.  42 U.S.C. §3604(a). Defendants omit the key phrase "otherwise make unavailable" in their recitation of what Section 3604(a) prohibits. (Motion at 15.) But this catch-all phrase in section 3604(a) is "as broad as Congress could have made it." *South Middlesex Opportunity Council, Inc. v. Town of Framingham*, 752 F. Supp. 2d 85, 97–98 (D. Mass. 2010), quoting *United States v. Hughes Memorial Home*, 396 F.Supp. 544, 549 (W.D.Va.1975). "Subjecting a person to harassment

17

because of race or national origin. . . that causes the person to vacate a dwelling," is a violation of this section, because it otherwise makes a dwelling unavailable. 24 C.F.R. § 100.60(b)(7).

*Plaintiff Donata Banks has not alleged a claim under this section of the FHA.* (See Brief in Opposition to Defendants' Motion for Judgment on the Pleadings, Dkt. 29 at 22.) Accordingly, whether she was constructively evicted from her dwelling is irrelevant. Plaintiff FHCCI, on the other hand, has alleged that it suffered injuries when Vicki New subjected residents to harassment because of race or national origin that caused them to vacate a dwelling.[3] Defendants cannot dispute that Vicki New made housing unavailable to residents like Latheresa Henderson-Diaz through her unrelenting racial harassment that caused them to move out. (Henderson-Diaz Dec. ¶ 11.) Moreover, the Court has already issued default judgment against Vicki New and in favor of FHCCI on this claim. Accordingly, the moving defendants' liability under section 3604 (a) turns on whether (1) they failed to take prompt action to correct and end her discriminatory housing practice; (2) they knew or should have known about that conduct; and (3) they had the power to correct it. 24 C.F.R. § 100.7(a)(1) (iii).

Section 3604(b) makes it a discriminatory housing practice "[t]o discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith because of race [and other protected classes]." 42 U.S.C. § 3604(b). One unlawful act prohibited by this section includes "[s]ubjecting a person to harassment because of race … or national origin that has the effect of imposing different terms,

---

[3] The Fair Housing Center of Central Indiana's claim stems from the damage to the FHCCI from the diversion of its resources to investigating defendants' practices and the frustration of its mission. *Fair Hous. Ctr. of Cent. Ind., Inc. v. Smitley*, No. 1:16-cv-880-WTL-DML, 2018 U.S. Dist. LEXIS 110814, at *5 (S.D. Ind. July 3, 2018) (*citing Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 n.19 (1982). That the FHCCI suffered damages has not been challenged by the defendants.

conditions, or privileges relating to the sale or rental of a dwelling or denying or limiting services
or facilities in connection with the sale or rental of a dwelling." 24 C.F.R. § 100.65(b)(7). Courts
have applied this section of the FHA to hold that creating or maintaining a hostile environment
based on race or national origin in connection with a dwelling constitutes a discriminatory housing
practice if it unreasonably interferes with the use and enjoyment of the premises. *DiCenso v.
Cisneros*, 96 F.3d 1004, 1008 (7th Cir. 1996); *see also* 24 C.F.R. § 100.600(a)(2) (hostile
environment harassment "refers to unwelcome conduct that is sufficiently severe or pervasive as
to interfere with . . . use or enjoyment of a dwelling [and] the terms, conditions, or privileges of
rental [of a dwelling]." In the housing context, even a "single incident of harassment because of
race" may be "sufficiently severe to create a hostile environment." *Id.,* § 100.600(c).[4]

        In *Miller v. Towne Oaks East Apts.*, 797 F. Supp. 557 (E.D. Tex. 1992), a Caucasian family
repeatedly complained to the apartment manager about racial slurs made toward his family by the
Black neighbors' sons. The manager failed to fully investigate the allegations and concluded that
there was nothing she could do to resolve the conflict. *Id.* at 561. The court ruled that the
manager's conduct violated the FHA, because tolerating racial harassment against a tenant
interferes with that tenant's right to enforce and enjoy their rental terms. *Id.*

        Similarly, in *Hicks v. Makaha Valley Plantation Homeowners Ass'n*, CIV. 14-00254 HG-
BMK, 2015 WL 4041531, at *12 (D. Haw. June 30, 2015), the court rejected defendants' motion
to dismiss plaintiffs' claim that the homeowners' association and management company should be

---

[4] Defendants cite *Morris v. Office Max, Inc.,* 89 F.3d 411, 413 (7th Cir. 1996) in support of their
assertion that they are entitled to summary judgment on all remaining claims, including the FHA,
unless plaintiffs establish "intentional discrimination." (Motion at 13.) *Morris* does not address
any claims or standards under the FHA. *Morris* only addresses liability under 42 U.S.C. §§ 1981
and 1982. *Id.* at 413-414. Plaintiffs address their 1982 claim below.

held liable for racially discriminatory conduct by a neighbor, because defendants knew of the conduct and failed to follow the CC&Rs and take remedial action.

Here, too, defendants cannot dispute that Vicki New's harassment of residents based on their race or national origin unreasonably interfered with their enjoyment of the premises. Plaintiffs present many incidents of harassment by Vicki New, including yelling racial slurs at neighbors on the street ("n___ bitch") and in front of their own homes. Donata Banks and her family changed their behavior to avoid Vicki New. (Banks depo. at 57:17-22.) It is beyond question that such conduct was sufficiently severe and pervasive to create a hostile environment on Twin Creeks Drive. Any attempt to label Vicki New's campaign as "offhand comments and isolated incidents" (Motion at 13) borders on ludicrous.

*Williams v. Arora Homeowners Ass'n*, 2021 U.S. Lexis 103488 (D.Md. June 2, 2021), cited by defendants at page 13 to their Motion, is inapposite. In that case, the plaintiff alleged that the management company and homeowners' association that governed her rental dwelling treated her differently by targeting her for strict enforcement of rules and levying fines based on her race or other protected classifications. *Id.* at *13-14. That case did not include any allegations of discrimination by a third-party that might subject the homeowners' association or management company to direct liability for their tolerance and inaction.

Alternatively, defendants are not entitled to summary judgment if there are genuine issues of fact establishing that defendants applied or enforced rules and privileges differently based on race. A homeowners' association that applies rules or privileges related to a dwelling differently because of protected class status also violates Section 3604(b), even if the plaintiff is not deprived of housing. In *H.O.P.E., Inc. v. Lake Greenfield Homeowners Association*, for example, plaintiffs alleged that the homeowners' association declined to enforce rules governing the construction of

20

outbuildings for white residents, but denied the Latino plaintiffs' requests to build one to store equipment while their house was under construction. 330 F. Supp. 3d 1105, 1116 (N.D. Ill. 2018). In denying summary judgment in defendants' favor, the court held that a homeowners' association that enforces its rules in a discriminatory fashion violates Section 3604(b). *Id.* at 1115; *see also Williams v. Arora Homeowners Ass'n*, 2021 U.S. Lexis at *18.

Defendants cite *Bloch v. Frischolz*, 587 F.3d 771 (7th Cir. 2009), in support of their contention that Ms. Banks must prove that defendants intentionally discriminated against her based on her race and rendered her home unavailable in order to prevail under the FHA. (Motion at 18.) That is not the standard under Section 3604(b). As set forth in *Bloch*, the standard of proof asserted by defendants applies only to a violation of Section 3604(a) in which plaintiff contends that defendant made housing "unavailable" – a claim that Ms. Banks has not brought here. Section 3604(b) broadly prohibits conduct that imposes different terms, conditions, or privileges related to a dwelling; constructive eviction is not a necessary element. (*Bloch,* 587 F.3d at 779.) In *Concerned Tenants Ass'n of Indian Trails Apartments v. Indian Trails Apartments*, 496 F.Supp. 522, 525 (N.D. Ill. 1980), the court rejected defendants' argument that a claim under 3604 (b) must be supported by evidence of intent to exclude protected class members. The Court found that "[s]uch a tortured interpretation of the application of s 3604(b) is ludicrous and runs counter to the plain and unequivocal language of the statute." *Id.*

Plaintiffs have established a prima facie case of disparate treatment in violation of Section 3604 (b). Defendants applied their rules and regulations differently and selectively in Twin Creeks based on race and national origin. Defendants regularly used their power in the CC&Rs to regulate a wide variety of conduct, including conduct on private property such as weed growth in the yard or algae on a private house. (Cristol-Deman Dec. at ¶ 15.) They "strictly" enforced the CC&Rs

21

and took an active role in regulating Twin Creeks, sending out hundreds of violation letters and filing at least 18 lawsuits against residents during the time that Vicki New was known to be harassing her neighbors. (Cristol-Deman Dec. at ¶ 13.) Defendants even filed a lawsuit against Vicki New seeking payment of her homeowners dues and were prepared to foreclose on her house for a debt of $1,978. (Motion at 24; Cristol-Deman Dec. ¶ 11.) Likewise, when defendants' role was undermined by Vicki New, they mailed a letter to the entire community to protect their reputation and interests. (Patterson depo. at Exhibits 12, 13 and 115:5-8, 116:13-23, 118:6-15, 119:2-12.) By contrast, they did not send a letter to the community warning of Vicki New's harassment. Nor did they file any legal action to restrain her. In short, the evidence shows that defendants strictly enforced the CC&Rs and filed legal actions to enforce them, except when the offensive conduct included racial harassment. As this court previously held, a defendant who tolerates a discriminatory, hostile environment but intervenes in non-race related disputes raises the inference of discriminatory intent. Dkt 60 at 13; *see also H.O.P.E. v. Lake Greenfield HOA*, 330 F.Supp. 3d at 1115.

Defendants argue that other rule violations and legal actions are distinguishable from Ms. New's harassment, but that does not make it so as a matter of law. The CC&Rs clearly grant the HOA the authority to bring legal action against a resident who fails to abide by them, as Vicki New repeatedly did. Indeed, Greg Chandler threatened to do just that in his letter dated September 25, 2016. These facts are sufficient to defeat summary judgment. It is up to the jury to decide whether defendants enforced their rules in a discriminatory manner.

Section 3604(c) prohibits making a statement, or causing the making of a statement, "with respect to the sale or rental of a dwelling that indicates any preference, limitation, or discrimination based on race . . . or national origin, or an intention to make any such preference, limitation, or

discrimination."   42 U.S.C. § 3604(c). It prohibits both oral and written statements and is not limited to advertisements.  24 C.F.R. § 100.75(b).

Defendants cannot dispute that Vicki New made discriminatory statements to neighbors based on race and national origin, including that the neighborhood was "better before all you n___s moved in," and there were going to be a bunch of "dead Mexicans" after a boundary dispute. (Banks depo. at 38:11-39:6; White depo. at Exhibit 42, 84:23-11; 109:16-19.) Moreover, this Court has issued default judgment against Vicki New and in favor of both plaintiffs under section 3604(c). Accordingly, the moving defendants' liability under section 3604 (c) turns on whether (1) they failed to take prompt action to correct and end her discriminatory housing practice; (2) they knew or should have known about that conduct; and (3) they had the power to correct it. 24 C.F.R. § 100.7(a)(1) (iii).

Section 3617 makes it unlawful to "coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of, or on account of his having exercised or enjoyed" any right protected by section 3604. 42 U.S.C. § 3617. An example of the conduct that is prohibited by this section is "[t]hreatening, intimidating or interfering with persons in their enjoyment of a dwelling because of the race …. or national origin of such persons." 24 C.F.R. § 100.400(c)(2). Defendants cannot dispute that Vicki New engaged in such threats, intimidation, and interference. Moreover, this Court has issued default judgment against Vicki New and in favor of both plaintiffs under section 3617. Accordingly, the moving defendants' liability under section 3617 turns on whether (1) they failed to take prompt action to correct and end her discriminatory housing practice; (2) they knew or should have known about that conduct; and (3) they had the power to correct it. 24 C.F.R. § 100.7(a)(1) (iii).

Defendants argue that plaintiffs' claim under section 3617 fails because plaintiffs have not established that the moving defendants acted with discriminatory intent. (Motion at 19-20.) Defendants misinterpret the intent standard. In determining whether plaintiffs can establish intent sufficient to defeat summary judgment, the court should not apply a rigid test requiring a "mosaic of circumstantial evidence" in support of the inference. (Motion at 21, *quoting East-Miller v. Lake County Hwy. Dep't*, 421 F.3d 558, 564 (7th Cir. 2009).) As the Seventh Circuit held in a subsequent discrimination case criticizing *East-Miller*, "the phrase misleadingly suggests that circumstantial evidence must combine to form a tidy, coherent picture of discrimination, in the same way the tiles of a mosaic come together to form a tidy, coherent image, in order for a plaintiff to survive summary judgment. This is not the standard." *Morgan v. SVT, LLC, 724 F.3d 990, 997* (7th Cir. 2013). Summary judgment must be denied if the plaintiff can present sufficient evidence of any kind that would permit a reasonable fact-finder to return a verdict in plaintiff's favor. *Id.*

*East-Miller*, cited by defendants*, is also distinguishable on the facts and the law. First, plaintiffs presented no evidence there that the defendants – county snowplow drivers – even knew plaintiff's race, let alone were motivated by race when they damaged plaintiff's mailbox and pushed snow into her driveway. (*Id.* at 563.) Without any evidence of racial slurs or other indicia of racial motivation, the court noted that "one cannot infer race discrimination" on such "minor incidents." (*Id.* at 563, 564.) Here, by contrast, the conduct tolerated by defendants included racial slurs that threatened, intimidated, and interfered with residents of color. Second, as set forth above, the Seventh Circuit has now endorsed a more flexible approach to establishing intent than the approach rigidly applied in *East-Miller*. Third, the *East-Miller* case did not involve evidence of defendants' tolerance of third-party conduct; instead, plaintiffs' theory of liability in that case was premised on defendants' own (or their agents) action.

24

The facts here establish that defendants knew of and tolerated Ms. New's racial harassment, which is evidence of discriminatory intent. *See Bradley v. Carydale Enterprises*, 707 F.Supp. 217, 224 (E.D. Va. 1989). ("Defendants' apparent toleration of the neighbors' racial harassment is evidence of defendants' discriminatory intent.")

### D. The undisputed facts do not show that defendants lacked notice of discriminatory animus until July of 2018.

Defendants claim that they took prompt action in July or August 2018 when they first learned of Vicki New's discriminatory animus. (Motion at 22.) That claim is directly controverted by admissible evidence submitted by plaintiffs. Attorney Greg Chandler's letter on behalf of the HOA, dated September 25, 2016, reveals that the moving defendants had actual knowledge of New's violations of federal law at that time. The letter indicates that the Defendants are aware that New is "constantly found in the community verbally assaulting owners and on one occasion spoke to a resident using racial epithets." (Dkt. 97-11 at 3.) If defendants' lawyer knew about the conduct, then defendants knew about it. *See Restatement 3rd of Agency* § 5.03 ("For purposes of determining a principal's legal relations with a third party, notice of a fact that an agent knows or has reason to know is imputed to the principal if knowledge of the fact is material to the agent's duties to the principal, unless the agent (a) acts adversely to the principal as stated in § 5.04, or (b) is subject to a duty to another not to disclose the fact to the principal.").

Notably, attorney Chandler's letter in September 2016 represents a significant change from his letter to Vicki New just three months earlier. Chandler's June 2016 letter raised concerns about New confronting residents and contractors as if she were as a member of the Board – essentially the complaints about the Board's authority that defendants admit they knew about. (Dkt. 97-11 at pages 1-2.) The September 2016 letter, by contrast, addresses far more serious allegations of abusive and illegal behavior, including "discriminatory comments." (Dkt. 97-11 at 3.) Comparing

25

these letters demonstrates that defendants had concluded that New's behavior escalated from annoyance to discrimination between June and September 2016 – not in 2018 as defendants allege.

There is other evidence that defendants knew or should have known about Vicki New's race-based conduct toward residents in and 2016. Kevin Patterson estimated that he received "in the ballpark" of more than 20 complaints about Vicki New between the time that she moved in in March 2015 until he left his position at Twin Creeks in June or July 2017. (Patterson depo. at 95:2-18.) Those complaints include three from Latheresa Henderson-Diaz, who resided in the same house as Ms. Banks in 2015 and complained of New's race-based threats (Henderson-Diaz Dec. at ¶ 7); an incident in 2016 in which New referred to Darryl Crenshaw's daughter, as "n____ bitch" and that the "neighborhood was better before all you n___s moved in" (Crenshaw Dec. at ¶ 8); three complaints in 2016 from a property management company about New bullying her neighbor and letting her pit bull loose in the neighbor's yard during a showing (Patterson depo. at Exhibit 10 at 2-3, Exhibit 14, and 109:16-19; 124:25-125:13, 126:17-22; 127:8-22; 135:24-136:2); a 2016 complaint that Vicki New was yelling in the street and threatening to break a resident's phone (Patterson depo. at Exhibit 16; 121:2-14); and a complaint in 2016 that New referred to a mixed-race couple whose child attended a resident's in-home daycare as "pieces of shit who should go back to [their] country." (Quinonez Dec. at ¶¶ 7-8.)

The facts set forth by plaintiffs also establish that if the moving defendants did not know about Vicki New's harassment before 2018, they should have. Her harassment was overt, taking place on Twin Creeks Drive, the main north-south artery in the neighborhood. (Banks depo. at Exh.1 and 26:23-10; Henderson-Diaz Dec. at ¶ 2.) Defendants' attorney himself conceded that her discrimination took place in plain sight, writing that "the entire Twin Creeks Community is keenly aware of Ms. New and her concerns. On an almost daily basis, Ms. New can be found roaming the

community, trespassing, verbally berating homeowners and residents, and standing in front of her property yelling at neighbors." (Dkt. 97-11 at 3.) Police cars in front of New's house on Twin Creeks Drive were a common sight. (Declaration of Bette Bowman, attached as Exhibit 1 to Cristol-Deman Dec., ("Bowman Dec.") at ¶ 4.) Alarming and obvious disturbances like this an otherwise quiet, suburban neighborhood could not and should not have gone unnoticed by board members and Kirkpatrick representatives in the years before 2018. Defendants simply have no basis on which to claim that the undisputed facts show that they had no knowledge of Vicki New's harassment until the summer of 2018.

### E. The undisputed facts do not show that defendants acted promptly and reasonably when they learned of Vicki New's discriminatory animus.

Likewise, defendants' claim that they acted promptly after they learned of Ms. New's discriminatory animus is not supported by undisputed facts. Defendants assert that when they first learned of New's racially-charged language in July 2018, the HOA "announced its desire to meet with concerned residents about New" and then swiftly sent a cease-and-desist letter to Vicki New that ended her harassment. (Motion at 22-23.) As set forth above, witnesses will attest, and defendants' attorney's letter demonstrates, that defendants knew about New's discriminatory conduct in 2016. Defendants' contention about the genesis of the resident meeting is also incorrect, as they neither announced nor hosted the meeting of concerned residents. In fact, resident Bette Bowman organized an initial meeting in July 2018, after manager Vince White told her that there was nothing that Kirkpatrick could do to stop Vicki New's campaign of harassment. (Bowman Dec. ¶¶ 5-6.) Bowman then contacted Vince White again after the meeting and relayed some of the accounts of severe, race-based harassment that residents shared. (*Id.* at ¶ 7.) Approximately two weeks later, on August 13, 2018, Vince White called and emailed Ms. Bowman, stating that the Board would like to meet with the group of concerned residents, and that

27

Board president Wyatt Smith would contact her to make arrangements. (*See* Cristol-Deman Dec. ¶ 14 and Exhibit 13; Bowman Dec. at ¶ 8.) Bowman did not hear from Smith for ten days, despite leaving multiple messages and emails for him. (Bowman Dec. at ¶¶ 9-11). The meeting between Bowman's group of concerned residents and the HOA Board finally took place on August 31, 2018, **after** Vicki New was charged with assault on Luvia Roman's husband and news media ran the video. (Bowman Dec. at ¶ 12.) No one from Kirkpatrick attended the meeting. (*Id.*) In short, the group was initiated and led by residents who were fed up that Kirkpatrick and the HOA had done nothing to stop Vicki New's ongoing harassment. The HOA met with residents only after the explosive events of late August 2018 could no longer be ignored.

In addition, defendants have not shown that the undisputed facts support their claim that they used all reasonable tools at their disposal to curb New's conduct and protect residents. Levying fines, evicting or foreclosing may not have been viable options, but letter-writing was not the only tool given to defendants by the CC&Rs. One measure that defendants could have taken was to suspend her voting rights as a member of the HOA for violating the rules, a power granted under the CC&Rs. (Dkt. 97-10 at 7.) The CC&Rs also specifically allow the HOA to bring legal action against those who fail to comply with the rules and regulations. (Dkt. 97-10 at 25.) This power to sue was acknowledged and threatened by defendants' attorney Greg Chandler in September 2016, but never used to restrain Vicki New from violating the rules. Moreover, it is a power that court records show that defendants used on 18 different occasions during the time that Vicki New lived in Twin Creeks. (Cristol-Deman Dec. at ¶ 13.)

Defendants assert that their letter-writing was a "reasonable" and sufficient response under the circumstances, and satisfied their obligation under the FHA. That assertion is based on controverted facts, inferences, and conclusory statements about the application of the law to those

28

controverted facts – each of which is solely the province of the fact-finder. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Guess v. Bethlehem Steel Corp.*, 913 F.2d 463, 465 (7th Cir. 1990) (holding that the effectiveness of the corrective action taken by defendants in response to co-worker harassment is a question of fact). Likewise, defendants have not offered any evidence in support of their hypothesis that their attorney's cease-and-desist letter, dated September 4, 2018, was the final straw that caused Vicki New to move out. (Motion at 14.) In fact, New apparently was quoted in media coverage of the August 2018 assault, before she received the cease-and-desist letter, stating that she intended to sell her property. (*See* Dkt. 97-11 at 8.) Ultimately, the relevant legal question is whether defendants took "remedial and preventative action [that] was reasonably calculated to end the harassment." *Turnbull v. Topeka State Hosp.*, 255 F.3d 1238, 1245 (10th Cir. 2001) (quoting *Adler v Wal-Mart Stores, Inc.*, 144 F.3d 664, 676 (10th Cir. 1998)). Plaintiffs have presented sufficient facts to establish that the moving defendants' meager efforts were too little and too late to prevent harm to many residents.

Finally, defendants revisit their prior arguments that they had no duty to enforce the CC&Rs against Vicki New because Ms. Banks was not a member of the HOA. This argument misses the mark here, just as the court held in its order denying defendants' motion for judgment. (Dkt. 60 at 10.) Donata Banks is not suing the HOA for enforcement of the CC&Rs. Rather, the CC&Rs are relevant here because they help define the conduct that violates the rules and the scope of defendants' powers to control such conduct. The scope of those powers is relevant to the third element under the direct liability standard – whether defendants had the requisite power to correct New's conduct. 24 C.F.R 100.7 (a)(iii); *National Fair Housing Alliance v. Deutsche Bank National Trust*, No. 18 CV 839, 2019 WL 5963633, at *9 (N.D. Ill. Nov. 13, 2019).

### F.  The moving defendants are directly liable for violations of 42 U.S.C. § 1982

Section 1982 provides that all citizens shall have the same rights as enjoyed by white citizens "to inherit, purchase, lease, sell, hold, and convey real and personal property." 42 U.S.C. § 1982. This section has been construed to prohibit discrimination based on race in a broad range of property rights, including rentals, sales, services related to property, and the right to "hold" property. *See, e.g., New West, L.P. v. City of Joliet,* 491 F.3d 717, 720 (7th Cir. 2007) (1982 protects the right to manage real property). The Supreme Court has stated that section 1982 should be broadly construed to effectuate the remedial purposes of the statute to "protect not merely the enforceability of property interests acquired by black citizens but also their right to acquire and use property on an equal basis with white citizens." *City of Memphis v. Greene,* 451 U.S. 100, 122 (1981); *accord Clark v. Universal Builders, Inc.* 501 F.2d 324, 330 (7th Cir. 1974).

Defendants contend that plaintiffs must establish that they discriminated in the making or enforcing of a contract. But section 1982 is not nearly as narrow as defendants contend. Unlike section 1981 of the Civil Rights Act, the word "contract" does not appear in section 1982. Section 1982's scope is not limited to discrimination in contracts. In *City of Memphis*, for example, the Supreme Court noted that section 1982 encompassed a challenge to a city action that benefited white residents but was denied to Black residents, or that diminished the property values of Black residents, or that restricted access to Black homes. *City of Memphis,* 451 U.S. at 123. As these examples illustrate, plaintiffs' claim here – that the moving defendants' conduct has interfered with the rights of Black and Latino residents to safely use and enjoy their houses in Twin Creeks – falls squarely within the ambit of section 1982.

Defendants argue that Ms. Banks' claim under Section 1982 fails as a matter of law because she has not shown that the moving "defendants had any intent to discriminate based on her race." (Motion at 26.) As one court has succinctly ruled in dispensing with the very same argument,

30

"defendants' shot is far wide of the mark; they misunderstand the point of plaintiff's claim." *Bradley*, 707 F. Supp. at 223. The moving defendants' argument here, just like in *Bradley*, "incorrectly focuses on the neighbor's racist acts rather than on defendants' apparent toleration of those acts. Such toleration arguably interfered with plaintiff's right to enforce and enjoy her lease. This is precisely what §§ 1981 and 1982 prohibit." *Id.*

Banks rented a house in a subdivision governed by the Twin Creeks HOA and managed by Kirkpatrick. Defendants' failure to stop Vicki New from engaging in racial harassment when they learned of it in 2016 interfered with Ms. Banks' rights to enjoy her home under the terms of her rental, because defendants' tolerance of the harassment altered the terms and conditions of her rental and deprived her of the right to enjoy her dwelling in the same manner as white residents. This is sufficient evidence to support a claim under Section 1982. *Bradley,* 707 F. Supp. at 224.

Defendants also have failed to establish that they are entitled to judgment on plaintiffs' disparate treatment claim under Section 1982. A defendant who provides different rules, services, or conditions to white and Black residents in connection with property violates section 1982. In *Concerned Tenants Ass'n of Indian Trails Apartments v. Indian Trails Apartments*, 496 F. Supp. 522, 524 (N.D. Ill. 1980), the court held that plaintiffs stated a claim under section 1982 based on allegations that the public housing provider reduced services and allowed the project to deteriorate when the demographics of the project shifted from predominantly white to predominantly Black. Likewise, providing short-shrift to complaints of race discrimination in violation of the CC&Rs while strictly enforcing other CC&Rs violates section 1982.

Plaintiffs support their claim under section 1982 with evidence that defendants applied their rules and regulations differently and selectively in Twin Creeks based on race and national origin by using their power to regulate a wide variety of conduct except for racial harassment. See

31

infra, Section III.C. Defendants' tolerance of Vicki New's constant harassment based on race and national origin interfered with Donata Banks' right to use and hold her property in the same manner as white residents. It is of no import that Donata Banks continued to reside in her house while the discrimination was ongoing, because the statute does not require proof of housing deprivation. *See Tillman v. Wheaton-Haven Recreation Ass'n*, 410 U.S. 41, 437 (1973) ("When an organization links membership benefits to residency in a narrow geographical area, that decision infuses those benefits into the bundle of rights for which an individual pays when buying or leasing within the area. The mandate of 42 U.S.C.A. § 1982 then operates to guarantee a non-white resident, who purchases, leases, or holds this property, the same rights as are enjoyed by a white resident."); *Bloch*; 587 F.3d at 775, 787; *Reeves v. Carrollsburg Condominium Unit Owners Ass'n*, 1997 WL 1877201, *8 (D.D.C. 1997). Accordingly, defendants are not entitled to summary judgment in their favor under section 1982.

### F.  Direct liability based on tolerating the acts of a third party is not a novel theory.

Plaintiffs do not claim and have never claimed that the moving defendants are vicariously liable for Vicki New's conduct. Defendants' liability is direct, not derivative, as it results from the moving defendants' own failure to take appropriate corrective action after adequate notice – in other words, an "adoption of the offending conduct and its results, quite as if they had been authorized affirmatively as the employer's policy." *Faragher v. City of Boca Raton,* 524 U.S. 775, 789 (1998); *see also Hostetler v. Quality Dining, Inc.*, 218 F.3d 798, 811 (7th Cir. 2000). Defendants' repeated references to vicarious liability (Motion at 27-28) are entirely irrelevant here, and it would be erroneous as a matter of law for the court to apply such principles here. *Dunn v. Washington County Hosp.,* 429 F.3d 689, 691 (7th Cir. 2005) (holding that district court improperly

32

granted summary judgment based on principles of *respondent superior* in a case involving employer liability for third-party conduct based on principles of direct liability).

Defendants characterize the scope of direct liability for third-party acts under the FHA as an unprecedented extension of the law. (*Id.*) Defendants are incorrect. In fact, there is abundant precedent for direct liability for the acts of third-parties under the FHA and other analogous statutes. Most notably, the Seventh Circuit has applied this principle in *Wetzel v. Glen St. Andrew Living Community, LLC*, 901 F.3d 856 (7th Cir. 2018), *cert. dismissed,* 139 S. Ct. 1249 (2019). Other courts have also held that defendants who tolerate FHA violations by neighbors against other neighbors may be held directly liable for tolerating conduct that they knew or should have known about. *See Neudecker v. Boisclair Corp.*, 351 F.3d 361, 365 (8th Cir. 2003); *Wilstein v. San Tropai Master Ass'n*, 1999 WL 262145, at *11; *Reeves v. Carrollsburg Condominium Unit Owners Ass'n*, 1997 WL 1877201 at *25 (D.D.C. 1997) (citing *Gittleman v. Woodhaven Condo. Ass'n*, 972 F. Supp. 894 (D.N.J. 1997).

Title VII, which is often considered a source for authority under the FHA (*see Dicenso*, 96 F.3d at 1008), applies similar principles of direct liability. Under Title VII, the EEOC and courts have long recognized that an employer may be liable for the conduct of third-parties such as customers and outside vendors who harass employees under a wide variety of circumstances. Regulations promulgated under Title VII provide, *inter alia,* that "[a]n employer may also be responsible for the acts of non-employees, with respect to sexual harassment of employees in the workplace, where the employer (or its agents or supervisory employees) knows or should have known of the conduct and fails to take immediate and appropriate corrective action." 29 C.F.R. § 1604.11 (e). Courts have consistently applied this standard. In *Galdamez v. Potter*, for example, the plaintiff alleged that co-workers and customers harassed her based on her race and national

33

origin. The Ninth Circuit not only held that an employer who fails to investigate or remedy harassing conduct by a third-party targeting one of its employees may be liable because it "ratifies or condones the conduct." 415 F.3d 1015, 1022 (9th Cir. 2005). The court also held that the plaintiff was not required to prove that the employer had discriminatory animus. *Id.* at 1022. The Seventh Circuit is no different in its application of direct liability for third-party harassment under Title VII. *See, e.g, Dunn v. Washington County Hosp.,* 429 F.3d at 691; *EEOC v. Costco Wholesale Corp.*, 903 F.3d 618, 624-25 (7th Cir. 2018); *accord Freeman v. Dal-Tile Corp.*, 750 F.3d 413, 422-23 (4th Cir. 2014); *Turnbull v. Topeka State Hosp.*, 255 F.3d 1238, 1244 (10th Cir. 2001). The policy principles supporting direct liability for failing to remedy a third-party's harassment is strong in the employment context governed by Title VII, but the right to live in an environment free of discrimination is even stronger in one's home.

Defendants contend that two cases dictate a contrary conclusion. (Motion at 29-30.) The first case that defendants point to, a District of Idaho decision from 2019, made a previous appearance in defendants' motion for judgment on the pleadings. (Dkt. 13 at 13-14.) Plaintiffs pointed out then that the Idaho decision is inapposite, because it is outside of this circuit, unique in its rejection of HUD regulations, based on a full trial record, and contrary to the Seventh Circuit's holding in *Wetzel*. (Dkt. 29 at 18-19.) The same reasoning applies now.

The second case that defendants rely on is *Francis v. Kings Park Manor,* 992 F.3d 67 (2d Cir. 2021). (Motion at 30-33.) Like the Idaho case, *Francis* represents a radical departure from previous case law and is divorced from the text, history, and purpose of the FHA. The court improperly rejected the possibility of direct liability without an agency relationship, which is contrary to both the FHA and Title VII. The analysis and holding in *Francis* also cannot be reconciled with Seventh Circuit precedent on the same issue in *Wetzel*. As a result of these

34

deficiencies, *Francis* should not deter this court from applying the HUD regulations, a long line of other case law, and common sense to hold that a homeowners association and management company granted various powers by their CC&Rs to enforce rules against residents may be held liable when they ratify discriminatory conduct by failing to exercise those powers to curb racially hostile environments. Here, there are, at a minimum, disputed facts as to whether defendants promptly and adequately exercised their powers to put an end to Vicki New's racial discrimination.

Dated:  September 3, 2021.

**Respectfully submitted,**

MACEY SWANSON LLP
  Jeffrey A. Macey
  jmacey@maceylaw.com
445 N. Pennsylvania Street
Suite 401
Indianapolis, Indiana 46204
Tel:   (317) 637-2345
Fax:  (317) 637-2369

BRANCART & BRANCART
*/s/ Liza Cristol-Deman*
  Liza Cristol-Deman (CA190516)
  lcristoldeman@brancart.com
Post Office Box 686
Pescadero, CA 94060
Tel:  (650) 879-0141
Fax:  (650) 879-1103

Attorneys for Plaintiffs

**Certificate of Service**

Pursuant to Rule 5 of the Federal Rules of Civil Procedure, on September 3, 2021, I caused the following document to be served by email via the Court's ECF system a copy of the document entitled – **BRIEF IN OPPOSITION TO DEFENDANTS' KIRKPATRICK MANAGEMENT COMPANY, INC. AND TWIN CREEKS HOMEOWNERS ASSOCIATION, INC.'S MOTION FOR SUMMARY JUDGMENT**

– upon the following attorneys:

Jeffery A. Macey
Macey Swanson LLP
445 N. Pennsylvania Street
Suite 401
Indianapolis, Indiana 46204
*jmacey@maceylaw.com*

Crystal S. Wildeman
Dinsmore & Shohl LLP
25 NW Riverside Dr., Suite 310
Evansville, IN 47708
*crystal.wildeman@dinsmore.com*

Jere A. Rosebrock
Alyson St. Pierre
Dinsmore & Shohl LLP
One Indiana Square, Suite 1800
Indianapolis, IN 43204-4208
Jere.rosebrock@dinsmore.com
Aly.stpierre@dinsmore.com

I further certify that counsel has no forwarding mailing address or valid email address for Pro Se Defendant Vicki New to send notice of the foregoing document.

*/s/ Liza Cristol-Deman*